THE S. S. INDIA ARROW.

THE S. S. JAVA ARROW.

SOCONY–VACUUM OIL CO., Inc., v. COLLINS et al.

No. 9404.

Circuit Court of Appeals, Fifth Circuit.

Dec. 19, 1940.

Rehearing Denied Jan. 14, 1941.

Robert Eikel, Jr., of Houston, Tex., for appellant.

Arthur J. Mandell, of Houston, Tex., for appellees.

Before SIBLEY, HOLMES, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

Two ships of the appellant were severally libelled by their respective crews to recover a bonus of $50 for each seaman under contracts to pay such bonus if the ship should call at Spanish ports, each ship having on the return voyage called at Santa Cruz de Tenerife to deliver cargo taken on at a port on the Mediterranean Sea. The sole question is whether the above-named port in the Canary Islands off the west coast of Africa is a Spanish port within the meaning of the contracts.[1] Judgment was given for the libellants.

The answers conceded that the port of Santa Cruz de Tenerife was in a general sense a Spanish port, but contended that it was not as the term used in the contracts, and that the expression was ambiguous and explainable; or if not it prayed to reform the con-

[1] The contracts are alike, except as to date and ship. One of them reads thus:

Socony-Vacuum Oil Company,
Incorporated,
26 Broadway.

New York, June 5, 1938.

Effective with the sailing of the SS India Arrow, all unlicensed personnel are to receive $5.00 increase per month in pay in lieu of accident or other special compensation insurance for such personnel, and therefore all demands for insurance are hereby withdrawn.

2. Effective with the sailing of the SS India Arrow the unlicensed personnel of this ship, should it call at Spanish ports, will be awarded $50.00 bonus for the trip, until such time as the U. S. Maritime Commission cancel similar basis applicable to Government operated ships which might call at Spanish ports.

3. It is agreed that no bonus will be paid unless the SS India Arrow calls at Spanish ports.

4. Should the SS India Arrow operated by this Company be arrested or interned because of the war hazards, the Socony-Vacuum Oil Company, Inc., Marine Transportation Department, agrees to pay the crew their regular wages during the period of arrest or internment.

Socony-Vacuum Oil Company, Incorporated, Marine Transportation Department,

E. W. Fiske, Jr., Port Captain.
R. Atwell,

N.Y.Del. 1, N.M.U., June 5, 1938.

tracts to express the mutual intent more clearly. The district judge thought the contracts clear and apparently rejected from consideration the evidence touching their genesis. In our opinion "Spanish ports" may mean either ports in Spain, or ports belonging to Spain. The evidence shows, as we judicially know, that the Canary Islands are hundreds of miles away from Spain, so that their ports are not in Spain and not Spanish ports in a geographical sense; but the Canary Islands are administratively a part of Spain, so that ports there are Spanish ports from a political standpoint. "Spanish river", or "Spanish mountain", would mean a river or mountain in Spain, but the expression Spanish port is fairly ambiguous. It is therefore proper to consider evidence of the circumstances and the intentions of the parties in their use of it.

■ The evidence shows without conflict that during the Spanish Civil War, on September 23, 1937, the United States Maritime Commission agreed to pay a cash bonus of $50 on government operated vessels which entered danger zones in Chinese and Spanish waters, and if vessels were interned to pay wages during such delay, defining the Spanish waters meant as "Territorial waters of Spain, Spanish Morocco and the Balearic Islands, including waters between the Balearic Islands and the Spanish mainland." On September 29, 1937, the Export Steamship Corporation and the National Maritime Union, by M. Byne (it being the union of which libellants are members), made a contract for a ship of that corporation, providing a $5 per month increase in pay and a $50 bonus, and wages during internment, but the bonus was to be paid only if the ship should "go into ports of Spain * * * until such time as the U. S. Maritime Commission cancels similar basis applicable to government operated ships which might call at Spanish ports." On October 7, 1937, appellant was about to sail a vessel into the Mediterranean Sea, and its representative, Capt. Fiske, at New York, conferred with Howard McKenzie acting for the National Maritime Union, called his attention to the action of the Maritime Commission, and exhibited a copy of the contract between the Union and the Export Steamship Corporation, and asked if it was satisfactory to be used with the vessels of appellant, and he agreed. Fiske then dictated a con-

tract which he thought was the same as the Export contract, but it used as to the bonus the words "should call at Spanish ports" instead of "going into ports of Spain." The wording was identical otherwise. Fiske executed it for appellant and McKenzie for the Union. Without any further discussion exactly similar contracts were later executed for seven other vessels of appellant, including the two here involved. None of these vessels was intending to go to the Canary Islands and those Islands were not discussed or considered in framing any of the contracts. On March 11, 1938, one of appellant's ships was about to sail from Boston to Santa Cruz de Tenerife, and a contract in the above form was tendered the crew, but they refused to sign on unless a bonus was provided for. Fiske conferred with the Union, speaking with M. Byne, who seems to be the same who signed the original Export Steamship Corporation agreement, and they agreed that the bonus contract did not include Tenerife, and that the crew should sign on without a bonus for going there, and this was done. The contracts before us were signed about two months later, on June 5 and June 17, with no notice to Fiske of any change of view or contention on the part of the Union. But libellants proved by a representative of the Union at New Orleans that on March 22, 1938, a union contract was signed in Texas with the American-West African Line for one of its vessels, providing a bonus of $50 if in the port of Tenerife, or 100 miles thereof, the ship should be attacked by airplane, armed trawler, or man of war. Fiske testifies without contradiction that the contracts he made were understood to refer only to the Spanish ports in the danger zone pointed out by the Maritime Commission, and had no reference to remote islands or possessions of Spain.

Since the American-West African contract was with another party and was altogether different in wording from those before us, and was not known to Fiske when these were made, nor considered in making them, it can throw no light on them. Yet the contracts in controversy do not stand independent and alone, but are mere repetitions as to these two ships of the original agreement made between appellant and the Union on October 7, 1937. The same form was used, with no further discussion of the terms. There is

a direct reference in the contracts to the action of the Maritime Commission as to "Spanish ports", which shows the parties intended their contract to have the same substantial scope as the action of the Commission. The practical interpretation of the contract in the case of the ship sailing from Boston to the Canary Islands on March 11, 1938, is a powerful evidence that neither side thought the Islands included Fiske's testimony to that effect is wholly uncontradicted.

With the intent of the Union thus established, the seamen whom it represented cannot claim a different intent. The Union and not they signed these contracts. The Union was their respresentative, and the contracts mean what their representative and the opposite party understood them to mean.

The judgment is set aside in each case and one will be entered dismissing the libel at libellants' cost.